### In re FLORIDA POWER & LIGHT CO.

Railroad & Public Utilities Commission.

June 30, 1955.

Lewis H. Fogle, Jr., Fogle & Fordham, Miami, for complainants.

Earl G. Kehoe, McBride & Kehoe, North Miami Beach, for Darling Stores Corp.

Arthur M. Laufer, New York City, for National Public Utility Service, Inc.

E. F. P. Brigham and C. Carey Matthews, both of Miami, for respondent.

Wilson McGee, assistant city attorney, Miami Beach, for the city, as its interest may appear.

Chairman WILBUR C. KING and commissioners JERRY W. CARTER and RICHARD A. MACK each participated in the disposition of this case.

## BY THE COMMISSION.

This proceeding was instituted by a formal complaint filed with this commission alleging that the electric rates and charges of Florida Power & Light Co. are unreasonable, excessive, arbitrary, and discriminatory and seeking an investigation and reduction of said rates and charges.

The original parties to the complaint were Leevlans Corporation, Raleigh Operating Co. Inc., President Madison Hotel, Normandie Hotel, Villa D'Este, Pershing Hotel, Harry Cohen d/b/a Hotel New Yorker, Albion Hotel, Platt Realty Co., Jack Mullikin, Sr. as receiver of MacFadden Deauville Hotel, Alfred Stone d/b/a the

Blackstone Hotel, Delano Hotel, Inc., Hotel Atlantis, Inc., Thomas Corporation, Coronet Hotel, Beham Corp., Seacomber-Surfcomber, Inc., H. Hillman d/b/a Gales Hotel, National Hotel, Jack Muravchick d/b/a Sagamore Hotel, Sudy Realty Corp., Di Lido Hotel, Inc., Prince Michael Corp., Dubrow Lincoln, Inc., Hoffmans Collins, Inc., Wolfies Lincoln, Inc., Carl Rippetoe, Jack Barcena, Jr., Mary L. Conley and Max Rosenthal.

During the progress of this cause the complainants Leevlans Corporation, Raleigh Operating Co. Inc., President Madison Hotel, Normandie Hotel, Villa D'Este, Pershing Hotel, Jack Mullikin, Sr. as receiver of MacFadden-Deauville Hotel, Alfred Stone d/b/a the Blackstone Hotel, Coronet Hotel, Beham Corp., Seacomber-Surfcomber, Inc., H. Hillman d/b/a Gales Hotel, Jack Muravchick, d/b/a Sagamore Hotel, Sudy Realty Corp., Di Lido Hotel, Inc., and Max Rosenthal have each requested the commission to remove, and the commission has removed, their respective names from the complaint herein.

Mangel Stores, Inc., Darling Stores Corp. and Grayson Shops, Inc. filed a petition for leave to intervene as parties complainant herein. Respondent filed a motion to strike the petition. Mangel Stores, Inc. and Grayson Shops, Inc. thereafter notified the commission that they desired to have their names withdrawn from the petition. We granted the request, and the petition for leave to intervene by Darling Stores Corp., together with respondent's motion to strike, were taken under consideration by the commission.

During the pendency of this proceeding the Greater Miami Beach Motel Association, the Atlantique Motel of Miami Beach, and J. & L., Inc., owners of Sunny Isles Motel, requested that their names be added as parties complainant. They were advised that under the commission's rules of practice they must file formal petitions for leave to intervene. No petitions have been filed and for that reason they are not deemed parties to this cause.

The commission served a copy of the formal complaint on the respondent Florida Power & Light Co., directing it to file such response thereto as it might deem appropriate. Respondent thereafter filed its motion to dismiss the complaint.

Respondent's motion is predicated on the grounds, inter alia, that the real parties in interest to the complaint are not the named complainants but in fact New York corporations known as National Utility Service, Inc. and/or Utility Analysis, Inc. and/or Utility Analysis Organization, hereinafter referred to as Utility Service

and Utility Analysis, respectively; that Utility Service and Utility Analysis were connected by contractual arrangements and had spread and fomented dissatisfaction among respondent's complaining subscribers and as a result thereof had been able to secure contracts with the subscribers pursuant to which Utility Service and Utility Analysis would receive one half of whatever reductions or rebates could be forced upon respondent; that this litigation was directly stirred up, excited, aroused, encouraged and instigated by Utility Service and/or Utility Analysis for their selfish and pecuniary gain in order that they might obtain a substantial portion of whatever funds they could compel respondent to pay the complaining parties; that this action is the result of the champertous methods and conduct of Utility Service and Utility Analysis which are attempting by this proceeding to use this commission to further their champertous ends and to assist them in illegally and unlawfully requiring respondent to reduce its rates in order unjustly to enrich themselves; and that the complaining parties named in the formal complaint constitute an insignificant percentage of the total electric customers of respondent—being less than one one-hundredths of one percent of respondent's 470,161 electric customers throughout the state and not in any respect representative thereof.

The commission thereafter designated one of its members to act as an examiner to hold a preliminary hearing in Miami for the purpose of receiving such relevant testimony and documentary evidence as might be produced by the parties which would assist it in arriving at a decision on the question whether the complaint should be entertained by the commission as the basis for a general investigation of the electric rates and charges maintained by Florida Power & Light Co. in the Miami area and throughout its system.

After the commission had served formal notice on the parties of the time and place of the preliminary hearing, respondent filed a petition for authorization of discovery depositions. The petition was granted by the commission, and pursuant thereto subpoenas duces tecum were issued requiring certain executive officers of the complaining parties to appear at a specified time and place and then and there produce any and all written agreements, correspondence, memoranda or documents which might be in their possession between said parties and Utility Service and/or Utility Analysis which resulted in the filing of the formal complaint herein. The depositions of these various executive officers of the complaining parties were taken at the time and place specified in

the subpoenas, and the court reporter's transcript thereof, together with certain agreements produced in response thereto, were filed with the commission at the preliminary hearing and constitute a part of the record herein.

Subsequently the complainants also filed their petition for authorization to take discovery depositions—which petition the commission likewise granted.

Prior to the preliminary hearing, and after the taking of depositions aforesaid, respondent filed an amendment to its motion to dismiss. This amendment included the additional grounds that the real parties in interest, Utility Service and Utility Analysis, by their methods and conduct herein have engaged in the unlawful practice of law in this state by soliciting contracts with the *"nominal"* complainants; that Utility Service and Utility Analysis agreed as a consideration for entering into the contracts to furnish, without charge to the *"nominal"* complainants, legal services including attorneys' fees and costs; and that the contracts are champertous and barratrous.

Typical provisions in contracts between the complaining parties and Utility Analysis Organization are found in the following excerpts taken from the agreement between that organization and the complainant New Yorker Hotel—

1. That the Organization proposes to make a complete technical investigation and analysis of the various factors in connection with existing utility rates and to negotiate for the Hotel in order to reduce existing utility rates; said organization agrees to discuss present and proposed rates with the utility company and, if necessary and practical, to present complaints to the Florida Railroad and Public Utilities Commission. * * *

3. In consideration of the sum of (heretofore paid) ($1.00), the Hotel mentioned herein, with a capacity of 76 rooms, agrees to engage the services of the Organization; that in addition to said sum, the Hotel agrees to pay the Organization fifty percent (50%) of all refunds received from the utilities, together with fifty per cent (50%) of all savings on utility bills due to any reduction in rate or utility charges based upon recommendations made or action taken by Organization or its assigns, associates or representatives for a period of three (3) years from the effective date of such reduction or savings; * * *

7. All costs including surveys and legal expenses to be borne by the Organization. * * *

In testifying about the foregoing contract Harry H. Cohen, coowner of the New Yorker Hotel, said—"I knew that as far as anything is concerned regarding this particular case, that it wouldn't

cost a nickel out of my pocket; that it was to be borne by Utility Analysis. I knew that, yes. What their procedure was, I didn't know. I never went into it."

Executive officers of various other complaining parties gave similar testimony concerning identical provisions in contracts between their establishments and Utility Analysis Organization.

Some contracts between various complaining parties and Utility Analysis, Inc., contained no specific provision that legal costs would be paid by the latter. Such contracts, however, contained no requirement that the complaining party would pay such costs, and the testimony of executive officers of complaining parties who entered into the contracts was conclusive that they were not to pay any part of the legal costs and expenses of this proceeding but that such costs and expenses were to be borne by Utility Analysis, Inc.

By written agreement which is a part of the record herein, Utility Service agreed to take over the servicing of the various contracts between Utility Analysis and the complaining parties and to pay all necessary expenses in connection with the servicing thereof. All proceeds which might be obtained from the contracts were assigned by Utility Analysis to Utility Service and in consideration thereof Utility Service agreed to pay Utility Analysis 25% of the net income received in connection with the servicing thereof after deducting, among other expenses, the following—"(a) Office expenses . . .; (b) Any attorneys' fees directly attributable to the servicing of said contracts; (c) The services of personnel and experts employed . . . or engaged in relation to any court or agency proceeding in connection with the servicing of said contracts, * * *."

The attorneys who filed the formal complaint on behalf of complainants are officers of Utility Analysis, Inc., according to a certificate of the Secretary of State which is a part of the record herein. A similar certificate shows that the attorney representing National Utility Service Inc. in the preliminary hearing herein, who urged the commission to entertain the formal complaint as the basis of an investigation of respondent's electric rates and charges, is a director of National Utility Service, Inc., which New York corporation has undertaken the servicing of the contracts hereinabove mentioned.

The record in this proceeding shows that neither Mary L. Conley or Carl Rippetoe, two of the complainants herein, are consumers of electricity or customers of respondent. Likewise, neither

Utility Service nor Utility Analysis are consumers of electricity or customers of respondent.

Voluminous briefs have been filed by the respective parties and oral arguments were heard by the full commission.

The described contracts have all the elements of champerty, showing that Utility Service and Utility Analysis have undertaken to employ and pay attorneys and other experts, and pay all legal costs and expenses, in the servicing thereof for a share of any refunds obtained or any amounts saved by the complaining parties as consumers of electricity for a period of three years. Nothing appears in the formal complaint or in the contracts or in the record herein to the effect that Utility Service or Utility Analysis, at the time the contracts were executed or now, have any interest either direct or remote, present or contingent, in the subject matter of this proceeding. It is the unlawful maintenance of a proceeding growing out of a bargain to divide that which might be saved the complainants if they prevail, or the unlawful maintenance of a proceeding in consideration of some bargain to have a part of the thing in dispute or some profit out of it, that the law condemns.

There are many features of the contracts and agreements which make them champertous. One important feature of a champertous contract which stands out here is the agreement by Utility Service and Utility Analysis to pay all legal costs of this proceeding in return for 50% of all rebates and savings that complainants may receive as a result of this proceeding over a period of three years.

Another feature of a champertous contract that is boldly evident in this case and one of the features condemned by law is that in which a person, for his own selfish gain, and a stranger to the subject matter, stirs up strife and litigation by bringing a proceeding which a party in interest might not do if left to his own judgment and not induced by the fact that *the litigation will be carried on at the expense of another for what he may acquire from the action maintained.*

Aside from the fact that this proceeding is the direct outgrowth of such champertous contracts, there are other elements of which we feel duty bound to take cognizance. Without hesitancy we condemn this entire proceeding and the real purposes for which it was instituted as contrary to the public policy of this state as well as the public interest and public welfare the protection of which is the direct and paramount duty and responsibility of this commission. The complaint is not in fact one by 12 or more consumers in Dade County, but on the contrary is a complaint by

Utility Service and Utility Analysis—prepared, signed and filed by their own attorneys without first obtaining supporting factual information from the complainants—and in many instances even without their prior knowledge. This is the first instance where an attempt has been made to use the powers and process of this commission in the furtherance of such a scheme as this record discloses, and we hasten to seize upon this first opportunity to place our stamp of disapproval upon this and similar schemes whereby disinterested parties, and strangers to the subject matter involved, seek to use the process of this commission for their own selfish gain. We likewise hasten to embrace this opportunity to allow the public to be advised of their rights in seeking redress and obtaining adequate public utility service at reasonable rates in conformity with controlling law. This commission was created by the legislature for the purpose of protecting the public against unreasonable and discriminatory charges by corporations engaged in rendering utility services. It is supported by appropriations from the general revenue fund of the state and the public is entitled to receive service from this commission in conformity with the law *and without obligating themselves to divide that which is theirs among those who would stir up and foment constant and perpetual rate litigation and strife for their own selfish gain.* This commission will always be receptive to the bona fide complaints of the public—and its staff of experts will always be available for the purpose of helping to determine whether some utility rate or charge is unreasonable or discriminatory. We will *not,* however, entertain complaints by individuals or organizations whose primary business is that of encouraging and instituting rate litigation for their own selfish gain.

There is one other feature involved in this proceeding which must be recognized if the public interest is to be protected. The respondent furnishes electric power to 470,161 customers in 32 of the 67 counties of the state. The formal complaint herein was ostensibly filed on behalf of only 30 such customers. Sixteen of the original complainants withdrew and two of the remaining fourteen were not customers of respondent. Thus, there remain only twelve complainants in this proceeding out of the total 470,161 customers served by respondent. General rate investigations of large utilities are time consuming and tremendously expensive for all parties concerned. Ultimately, of course, such expense must be borne by the rate payer. Regardless of the level of rates charged by any public utility there can always be found some customers who are dissatisfied with the rates they pay and who will be willing to seek a rate investigation and reduction of such rates *when the*

*immediate costs thereof will be borne by someone else.* It is not difficult to stir up and foment rate dissatisfaction when the intermeddler agrees to pay all costs incurred in bringing about a rate investigation on the promise that he will receive nothing more than a portion of any rebate or saving that may be obtained. If this scheme of developing rate investigations is recognized and encouraged, there will be no end to the investigations this commission will be called upon to conduct in order that such intermeddlers may remain in business. The appropriations which finance the operations and activities of this commission are limited in amount and could never support the constant and terrific drain which would result from the implementation of such a policy. The practicalities involved prohibit the indulgence of any such policy. Then, too, the phenomenal construction programs of Florida's ever-expanding public utilities would be stifled because the necessary capital would be difficult to obtain at reasonable interest charges in the face of the inevitably continuous rate investigation, which would result from such a policy. The industrial development of the state would be retarded and suffer because of the inability of public utilities to meet the increasing demands for service. Even if it were feasible from a practical viewpoint, it would be economically unsound for a regulatory agency in the nation's fastest growing state to permit or encourage continuous rate investigations at the instigation of those whose only interest is to obtain a portion of any rebate or reduction which might accrue to the utility customers. While this commission will not tolerate unreasonable and discriminatory rates for public utility services, it has a responsibility to maintain financially sound public utilities in order that they may be able to meet the demand for adequate service and facilities.

This commission is fully advised concerning the earnings of all utilities under its jurisdiction and will not hesitate to institute rate investigations on its own motion whenever the earnings of a utility exceed a reasonable rate. Likewise the commission is constantly reviewing the rates for the different classes of service furnished by all utilities and from time to time requires adjustments when inequities are discovered. Even now the commission's staff is conducting under the directions of this commission an investigation of the rates involved in this proceeding, as well as other public utility rates charged throughout the state. At the same time customers who have bona fide complaints concerning their individual rates may appeal to this commission for appropriate redress—without contracting away substantial portions of any savings they may hope to obtain.

The commission finds, in conformity with the recitals above set out in this order, that this proceeding is the result of champertous contracts, is contrary to the public policy of the state, constitutes a serious threat to the public interest and public welfare, and should not be entertained by this commission.

It is ordered that respondent's motion to dismiss, as amended, be and the same is hereby granted, and this proceeding is hereby dismissed.